IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THEODORE (TED) E. DAUVEN,

      Plaintiff,

                               3:09-cv-1471-PK

                               FINDINGS AND

v.                               RECOMMENDATION

U.S. BANK NATIONAL ASSOCIATION,
et al.,

      Defendant.

_____

PAPAK, Judge:

      Plaintiff Ted Dauven brings this suit alleging state law battery and false imprisonment

claims against Defendants U.S. Bancorp, U.S. Bank National Association (collectively, U.S.

Bank) and Wells Fargo.  Before the Court are Plaintiff's Motion for Leave to File an Amended

Complaint (#75) and Defendant's Motion for Summary Judgment (#91).  For the reasons below,

both motions should be denied.

///

Page 1 - FINDINGS AND RECOMMENDATION

# BACKGROUND

## I.    Factual History

Plaintiff and his family leased a property at 13120 Thoma Road, Lake Oswego, Oregon (the "Property") from its owner beginning in July or August 2006. (#51, at ¶ 29.) In 2008, the owner of the Property defaulted on the loan, leading to foreclosure of the Property in July 2009. (Smith Decl., #93, Ex. 1) (Ted Dauven Deposition, at 23:11-20, 25:21-26:1.) On August 12, 2009, Jenaya Carter, an attorney representing U.S. Bank, sent Plaintiff a letter providing notice that as a result of the foreclosure, Plaintiff had 90 days to vacate the Property, or eviction proceedings would be commenced. (#51, at ¶ 59.)

On December 1, 2009, a man in a police uniform (the "December Officer") visited the Property. The December Officer dressed in "blue SWAT fatigues" and employed red flashing lights on his truck. (Ted Dauven Depo., at 88:3-4.) Initially, the December Officer talked with Barabara Dauven, the Plaintiff's wife, on the front porch. (Barbara Dauven Decl., #96, at ¶5.) The December Officer refused to show Barbara Dauven an ID as she requested, and she asked Ted Dauven to join them on the porch. *Id.* As soon as Ted Dauven appeared on the porch, the December Officer's demeanor immediately became aggressive and hostile. (Ted Dauven Depo., at 96:2-17); (Barbara Dauven Decl., #96, ¶¶6-7.) Ted Dauven asked the December Officer what authority he had to come onto the Property. *Id.* at 87:7-19. The December Officer began yelling, stating that he was a police officer with the State of Oregon and possessed a legal right of way to go from the street to the Plaintiff's door. *Id.* at 87:13-25.

When Ted Dauven asked the December Officer for identification, he again refused to show any official documents and threatened to call local police and have the Dauvens arrested if

they did not cooperate further. *Id.* at 114:1-9; (Barbara Dauven Decl., #96, at ¶16.) The December Officer then stated that he was at the Property on behalf of the owner to investigate if and why the Dauvens were still at the residence. *Id.* at 114:1-6, 115:2-8. Specifically, the December Officer alluded to his knowledge of previous visits by police officers to the Property, eviction threats against the Plaintiff in July 2009, and the Plaintiff's failure to respond to those threats. The December Officer maintained that all information had been provided to him by the owner of the property, whom he was representing. (Barbara Dauven Decl., #96, at ¶¶ 10-14.)

At some point, Plaintiff began to walk toward the December Officer's truck to obtain the license plate number. (Ted Dauven Depo., at 106:2-25; 107:1-13.)   In response, the December Officer placed his hands on the Plaintiff's chest and told Plaintiff "you don't go near my truck." *Id.* at 91:1-24; 92:3-8; 107:14-24; (Barbara Dauven Decl., #96, at ¶27.) Mrs. Dauven then requested that the Plaintiff go back inside the house to avoid a potential altercation. *Id.* at 257:20-258:1. Plaintiff moved toward the house, but was instructed by the December Officer to stay on the porch. *Id.* at 108:5-10. Eventually, after talking more with Barbara Dauven, the December Officer stated that "this sounds like a civil matter," and left the Property without further incident. *Id.* at 133:12-17. As a result of the encounter with the December Officer, the Plaintiff contends that he suffers from "increased insomnia, depression, defensiveness, hostility and physical exhaustion, and loss of mental acuity with regard to time memory." (Pl.'s Resp., #95, at ¶ 31.)

## II.   Procedural History

Sometime in 2009, the owner of the Property defaulted on the loan, resulting in a foreclosure on the Property on or about July 1, 2009. (Third Am. Compl., #51, at ¶ 9.) On

December 29, 2009, in the forcible entry and detainer ("FED") matter of *U.S. Bank National Association v. All Occupants of the Premises, Ted Dauven*, Clackamas County Circuit Case No. FE 092002, the Clackamas County Circuit Court entered a general judgment requiring Plaintiff and his family to relinquish possession of the Property to Defendants. Plaintiff and his family refused to vacate the property. On May 13, 2011, in the matter of *U.S. Bank National Association v. Ted Dauven and Barbara Dauven*, Clackamas County Circuit Court Case No. FE 110602, the Clackamas County Circuit Court entered a second General Judgment for a money award and ordered that possession of the Property be returned to the owner. (Decl. of Megan E. Smith, #65, Ex. 1.) On May 20, 2011, a Writ of Execution was issued and Plaintiff and his family vacated the property. ( Pl.'s Renewed Motion for Leave to Amend, #75, at 7.)

On December 16, 2009, Plaintiff Ted Dauven and former Plaintiffs Barbara Dauven and Christina Dauven, proceeding pro se, filed their initial complaint in this matter. (#2.) On January 20, 2010, the Plaintiff filed an Amended Complaint to comply with the Court's Order to Show Cause regarding subject matter jurisdiction. (#17). On June 7, 2010, this Court recommended dismissing the Plaintiff's Amended Complaint and granting leave to amend, explicitly identifying the deficiencies of the Plaintiff's claims. (#28). On July 1, 2010, United States District Court Judge Garr M. King adopted the Findings and Recommendations in their entirety, granting Plaintiff leave to amend. (#30.)

On July 30, 2010, Plaintiff filed a Second Amended Complaint. Again, the Court recommended granting the Defendants' motion to dismiss on subject matter jurisdiction and granting Plaintiff leave to amend the Second Amended complaint. (#40). Only the Plaintiff's claims for battery and false imprisonment survived the Motion to Dismiss. *Id.*

On December 30, 2010, Plaintiff filed a Third Amended Complaint (#47), followed by a corrected Third Amended Complaint on February 1, 2011. (#51).

Plaintiff moved for leave to file a Fourth Amended Complaint on July 20, 2011. (#61). This Court denied that motion by Order dated September 20, 2011. (#67). Since then, Defendants have served discovery requests on the Plaintiff and taken the depositions of Plaintiff and his family. Discovery closed on February 14, 2012, the same day Plaintiff filed the present motion to amend. Plaintiff now seeks leave to file what would be his fifth complaint in this case. The proposed amended complaint includes a new gross negligence claim alleging that Defendants failed to provide Plaintiff with proper notice of eviction and seeking damages for the loss or damage of his personal property due to the eviction. Defendants subsequently moved for summary judgment on the Plaintiff's battery and false imprisonment claims. (#91.)

## LEGAL STANDARDS

### I.    Motion to Amend

A party may amend a pleading once as a matter of course before being served with a responsive pleading or within 20 days after serving the pleading but thereafter may only amend by consent of the opposing party or leave of the court. Fed. R. Civ. P. 15(a). "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend is within the discretion of the trial court, but that discretion "should be guided by the underlying purpose of Rule 15(a) which was to facilitate decisions on the merits, rather than on technicalities or pleadings." *In re Morris*, 363 F.3d 891, 894 (9th Cir. 2004) (citation omitted). "A district court may, however, take into consideration such factors as bad faith, undue delay, prejudice to the opposing party, futility of the amendment, and whether the party has previously amended his

pleadings." *Id.* (citation omitted). "An outright refusal to grant leave to amend without a justifying reason is . . . an abuse of discretion." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1034 (9th Cir. 2008) (citation omitted).

A motion for leave to amend should be granted unless there has been a showing that to permit the amendment would produce an undue delay in the litigation, that the motion was brought in bad faith or out of dilatory motive, that the movant has repeatedly failed to cure deficiencies in the complaint by previous amendments, that the proposed amendment would unduly prejudice an opposing party, or that the proposed amendment would result in futility for lack of merit. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Moreover, it is well settled that, of these factors, the most important is the potential for prejudice to opposing parties, *see Jackson*, 902 F.2d at 1387, *citing Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31 (1971), that futility alone is sufficient grounds for denying a motion to amend, *see Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004), *quoting Nunes v. Ashcroft*, 348 F.3d 815, 818 (9th Cir. 2003), and that undue delay alone is insufficient to justify the denial of a motion for leave to amend, *see Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999).

## II.    Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

Page 6 - FINDINGS AND RECOMMENDATION

1995), *cert. denied,* 116 S.Ct. 1261 (1996).  In evaluating a motion for summary judgment, the

district courts of the United States must draw all reasonable inferences in favor of the nonmoving

party, and may neither make credibility determinations nor perform any weighing of the

evidence.  *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v.

Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

**DISCUSSION**

## I.    Motion to Amend

As explained below, Plaintiff's motion for leave to amend should be denied because the

proposed gross negligence claim is futile and allowing the Plaintiff's amendment would create

undue delay and prejudice the Defendants.

### A.    Futility

Courts in this circuit typically find a proposed amendment to be futile when the complaint

as amended would either fail to state a claim or certainly be defeated on summary judgment.  *See

Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990) (amendment futile because

proposed amendment would appear not to state a claim); *Roth v. Garcia Marquez*, 942 F.2d 617,

628-629 (9th Cir. 1991) (amendment to specifically plead additional facts relevant to a claim the

court had already considered would be futile because the claim "would certainly be defeated on

summary judgment").  Under either standard, Plaintiff's new claim for "gross negligence" is

futile.

The Plaintiff contends that as a tenant, the he was entitled to written notice before his

belongings were removed from the Property in late May 2011.  But the Plaintiff's claim is futile

because he was not a "tenant" at that time and therefore not entitled to receive written notice

under Oregon law.  ORS 90.425(3) sets forth a landlord's notice requirements for disposing of a

tenant's property:

> (3) Prior to selling or disposing of the tenant's personal property under this section, the
> landlord must give a written notice to the tenant that must be:
> (a) Personally delivered to the tenant; or
> (b) Sent by first class mail addressed and mailed to the tenant at:
> > (A) The premises;
> > (B) Any post-office box held by the tenant and actually known to the landlord;
> > and
> > (C) The most recent forwarding address if provided by the tenant or actually
> > known to the landlord.

In turn, ORS 90.100(45) defines a "tenant" as "a person, including a roomer, entitled under a

rental agreement to occupy a dwelling unit to the exclusion of others, including a dwelling unit

owned, operated or controlled by a public housing authority."

The Plaintiff does not meet the statutory definition of "tenant."  In December 2009, and

again in May 2011, the Clackamas County held in separate FED actions that Plaintiff was not

entitled to occupy the premises.  (#65, at Ex. 1.)  The Plaintiff also testified that his family did

not pay rent on the Property from July 2009 until they vacated the property in May 2011. (Ted

Dauven Depo., at 181:3-7.)

The Plaintiff argues that the FED actions were "errant" because the Clackamas County

Circuit "ignored" the Plaintiff's jurisdictional and MERS fraud claims.  This Court is not the

proper forum to challenge the FED decisions.  They are a valid determinations of the Plaintiff's

tenant status until they are amended or overturned  on appeal.

### B.    Undue Delay

The timing of Plaintiff's motion also suggests amendment would be improper.  First,

courts are reluctant to grant motions to amend after parties have finished discovery and filed

Page 8 - FINDINGS AND RECOMMENDATION

summary judgment motions. *See Schlacter-Jones v. Gen. Tel. of Cal.*, 936 F.2d 435, 443 (9th

Cir. 1991), *overruled on other grounds by Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683

(9th Cir. 2001) ("The timing of the motion, after the parties had conducted discovery and a

pending summary judgment motion had been fully briefed, weighs heavily against allowing leave

[to amend.]"). For example, in *M/V Am. Queen v. San Diego Marine Constr. Corp.*, the Ninth

Circuit affirmed the district court's denial of leave to amend when the district court found that,

among other factors, plaintiff waited one and a half years after the initial complaint to move for

amendment and a motion for summary judgment was already pending. *M/V Am. Queen v. San

Diego Marine Constr. Corp.*, 708 F.2d 1483, 1492 (9th Cir. 1983).

Despite the presumption towards granting amendments to *pro se* plaintiffs, allowing the

Plaintiff to amend the complaint here would create undue delay. This is the Plaintiff's fifth

attempt to amend his complaint. Plaintiff was aware of the newly alleged facts within weeks after

being evicted from the property in May 2011. He was also aware of these facts when the Court

granted his previous motion to amend on September 20, 2011. Instead of attempting to add the

gross negligence claim them, Plaintiff waited until after discovery closed and after the

depositions of Barbara and Christiana Dauven on January 11, 2012 and January 12, 2012,

respectively. Granting the Plaintiff's motion would force the court to re-open discovery to allow

Defendants to investigate the new set of alleged facts. In light of the Plaintiff's earlier awareness

of these facts, the Court cannot allow the undue delay resulting from Plaintiff's motion to amend.

Nevertheless, since delay alone, without prejudice, does not usually warrant denial of leave to

amend, I proceed to examine potential prejudice to the opposing party. *See United States v. Pend

Orielle Pub. Util. Dist. No. 1*, 926 F.2d 1502, 1511 (9th Cir. 1991) (abuse of discretion when

only factor considered was delay).

### C.    Prejudice to the Defendants

Granting Plaintiff leave to amend would also unfairly prejudice the Defendants. Primarily, amendment would require Defendants to conduct additional discovery to address plaintiff's new theories that rely on substantially different facts. The amendment raises new and different issues that would require extensive discovery and legal fees. Defendants would likely need to engage in new written discovery and retake depositions. *See Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1399 (9th Cir. 1986) (affirming denial of leave to amend when allowing amendment would prejudice the defendant "because of the necessity for further discovery"); *cf. Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998) (prejudice found when issues raised by proposed amendment involved new factual and legal issues and would require additional discovery).

## II.    Motion for Summary Judgment

Defendants' motion for summary judgment should be granted. Despite Defendants' arguments to the contrary, Plaintiff satisfies the jurisdictional amount in controversy requirement and also creates several questions of material fact on his tort claims.

### A.    Amount in Controversy

The Plaintiff bears the initial burden to establish diversity jurisdiction, including that the damages relating to his two claims of battery and false imprisonment are sufficient to meet the $75,000 amount in controversy requirement. 28 U.S.C. §1332(a). Here, the Plaintiff argues that the December Officer's battery and false imprisonment have caused him to suffer from "increased insomnia, depression, defensiveness, hostility and physical exhaustion, and loss of mental acuity

with regard to time memory." (#101, at ¶31.)  The Plaintiff does not allege he suffered any physical injury, but he prays for compensatory damages of $100,000 and punitive damages of $500,000 on each of these claims. (#51, at 24.)

The Defendants argue that the Plaintiff's initial burden in pleading compensatory damages is to raise the amount of purported damages past the speculative level.  *See Parker v. Harris Pine Mills*, 206 Or. 187, 197 291 P.2d 709 (1955).  However, *Parker* does not control here because the question of the amount in controversy is decided under federal, not state, standards.  *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 352 (1961).

Generally, "the amount in controversy is determined from the face of the pleadings." *Crum v. Circus Circus Enters.*, 231 F.3d 1129, 1131 (9th Cir. 2000).  The amount in controversy alleged by the proponent of federal jurisdiction controls only if the claim is made in good faith. *Id.* "To justify dismissal, it must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *Id.* (internal quotation omitted).  A federal court has subject matter jurisdiction unless "upon the face of the complaint, it is obvious that the suit cannot involve the necessary amount." *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 292, 58 S.Ct. 586, 82 L.Ed. 845 (1938).  When the jurisdictional amount is challenged by the Defendants in a case originating in federal court, the burden is on the Plaintiff to show, using competent proof, that it does not appear to a legal certainty that the claim for relief is for less than the statutorily prescribed jurisdictional amount. *Id.* at 288 n. 10, citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182-189 (1936).

Applying the legal certainty standard to unliquidated damages in a tort case presents unusual challenges for this Court.  The Ninth Circuit has not advanced a clear standard for what

constitutes "competent proof" in unliquidated damages cases. However, this Court finds the

Eighth Circuit's formulation of the legal certainty test to be particularly persuasive:

> As we see it, the federal court has jurisdiction here unless, as a matter of law, [Plaintiff] could not recover punitive damages or damages for emotional distress, the amount of damages that she could recover is somehow fixed below the jurisdictional amount, or no reasonable jury could award damages totaling more than $75,000 in the circumstances that the case presents.

*Kopp v. Kopp*, 280 F.3d 883, 885 (8th Cir. 2002).

Oregon law allows claims for noneconomic damages, including emotional distress

damages, but caps such claims at $500,000. ORS 31.710. To recover punitive damages in a civil

action, the Plaintiff must prove by clear and convincing evidence that the Defendant "has acted

with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of

harm and has acted with a conscious indifference to the health, safety, and welfare of others."

ORS 31.730(1). A corporate defendant can be liable for punitive damages for its employees'

intentional torts. *Stroud v. Denny's Rest., Inc.*, 271 Or. 430, 435, 532 P.2d 790, 793 (1975) (en

banc). However, punitive damages are not available when based on an intentional act within a

non-employee agent's apparent, but not actual, authority. *Badger v. Paulson Inv. Co.*, 311 Or.

14, 28–29, 803 P.2d 1178, 1186 (1991).

Here, the Plaintiff's claimed compensatory and punitive damages are not automatically

precluded by statutory or judicial limitations. Moreover, based on the facts in Plaintiff's

deposition and his wife's declaration, a reasonable jury could conceivably award punitive and

compensatory damages in excess of $75,000 if it finds that Defendants were vicariously liable for

the torts allegedly committed against the Plaintiff by the December Officer. As such, the

Plaintiff's claims pass the legal certainty test articulated in *Kopp*.

The Defendants fail to advance any arguments that the non-economic damages at issue cannot exceed $75,000 to a legal certainty. A defendant can prove that a plaintiff's alleged damages will not meet the jurisdictional amount by citing factually similar cases where the jury failed to award damages that exceeded $75,000. *Beaver v. NPC Intern, Inc.,* 451 F. Supp. 2d 1196, 1998 (D. Or. 2006). The Defendants do not cite to any similar cases with low recoveries, but instead argue that the Plaintiff's damages are "vague." Yet even the supposed vagueness of Plaintiff's damages at this stage in the proceeding would not necessarily prevent a jury from awarding the amount Plaintiff seeks at trial. Finally, there is also no evidence indicating that this suit was filed in bad faith or, for example, that the Plaintiff's decision to file this suit in federal court is a means of forum shopping. *See Crum,* 231 F.3d at 1131. In sum, the Plaintiff satisfies the amount in controversy requirement.

### B.    Vicarious Liability

The Plaintiff's intentional tort claims – false imprisonment and battery – derive from a single occasion when the December Officer entered the Property and allegedly intimidated the Dauvens. Since the December Officer is not a defendant in this suit, defendants can show that Dauven's claims fail as a matter of law if they demonstrate that there is no factual dispute concerning whether the Defendants are vicariously liable for the torts allegedly committed by the December Officer. There are two primary ways a principal can be liable for the torts of its agent, depending on type of agency relationship that exists. *Vaughn v. First Transit, Inc.,* 206 P.3d 181 (2009); *Jensen v. Medley,* 336 Or. 222, 230, 82 P.3d 149 (2003). First, under the doctrine of *respondeat superior,* an employer may be liable for an employee's torts committed while acting

within the scope of employment.[1]  *Id.* ("A principal is liable for all torts committed by its employees while acting within the scope of their employment.").  Second, a principal may also be liable for torts of a non-employee agent if the agent's actions are "within the actual or apparent authorization of the principal."  *Jensen*, 336 Or. at 231.  Finally, even if the December Officer was a law enforcement officer rather than an employee or non-employee agent, a third potential mechanism exists to hold Defendants vicariously liable for his conduct.  Below I analyze how all three apply to this case, concluding that a jury could find Defendants vicariously liable for the December Officer's conduct, but only under a *respondeat superior* theory.

## 1.    *Respondeat Superior* Liability

A corporation may be held vicariously liable for an intentional tort of its employee if the tort is committed in the course and scope of employment.  *Chesterman v. Barmon*, 305 Or. 439, 753 P.2d 404 (1988).  Traditionally, three requirements must be met to conclude that an employee was acting within the scope of employment: (1) the act occurred substantially within the time and space limits authorized by the employment; (2) the employee was motivated, at least partially, by a purpose to serve the employer; and (3) the act is of a kind which the employee was hired to perform.  *Chesterman*, 305 Or. at 443.  Oregon courts have clarified, however, that vicarious liability may still attach for a later intentional tort that results from earlier activities carried out within the scope of employment.  *See Fearing v. Bucher*, 328 Or. 367, 374-375, 977 P.2d 1163 (1999).  In other words, an intentional tort that is the culmination of a progressive series of actions that involved an employee's ordinary and authorized duties still satisfies the

---

[1] Oregon courts sometimes refer to a "master's" liability for acts of "servant" agents, rather than the doctrine of *respondeat superior*. *See, e.g., Jensen*, 336 Or. at 230.

*Chesterman* test. *See Lourim*, 328 Or. 380, 386, 977 P.2d 1157 (1999). In sum, "direct

causation, not 'reasonable foreseeability' . . . , is the *sine qua non* of *respondeat superior*

liability." *Bray v. American Prop. Mgmt. Corp.*, 164 Or. App. 134, 141, 988 P.2d 933 (1999).

 As a threshold matter, there remains a factual dispute over the December Officer's role

when he came to the property, including whether he was, in fact, Defendants' employee.

Defendants basically contend that because the December Officer *identified* himself as a police

officer and because Dauven *believed* him to be one, the December Officer was, in fact, a member

of law enforcement.[2] Defendants reason, therefore, that the December Officer could not have

been an agent of Defendants, let alone their employee. But Defendants' evidence is insufficient

to preclude the application of vicarious liability.

 The December Officer's representation, even if believed, cannot by itself prove his law

enforcement status. Other facts presented by Dauven call into question the December Officer's

claim of being an Oregon police officer. The December Officer did not wear any official

identification, rebuffed Plaintiff's efforts to obtain his identification or license plate numbers, and

even threatened to call the police and have Dauven arrested. Ted Dauven Dep. at 114:1-9; Decl.

of Barbara Dauven, at ¶16. Morever, Defendants present no evidence from the State of Oregon

or any law enforcement agency that a police officer actually visited the Property. Consequently,

making inferences in favor of Dauven, the non-moving party, a reasonable jury could conclude

that the December Officer was not a police officer. Given that the December Officer stated he

---

 [2] I note that some evidence can be interpreted to suggest the December Officer was a member of law enforcement. He wore a SWAT uniform, had a siren on his truck, and acted like law enforcement by invoking his official right of way and commenting that the case was merely a "civil matter" upon leaving. (Ted Dauven Depo., at 118:11-25; 119:1-13); (Decl. of Barbara Duaven, at ¶ ¶ 21, 34.)

was representing the property owners and that Defendants fail to adduce any evidence attesting

that none of their employees visited the Property in the manner described by the Dauvens, the

jury could also conclude that the December Officer was Defendants' employee. (Barbara

Dauven Decl., #96, at ¶¶ 10-14.)

Defendants also cannot show the absence of a genuine issue of fact on the elements of the

*Chesterman* test, as refined by *Fearing* and *Lourim*. Defendants argue that, even if the December

Officer had any authority to act on behalf of the Defendants, that authority was strictly limited to

investigation. Touching Dauven and telling him to remain on the porch went well beyond

investigation, Defendants insist. However, the appropriate focus for the purposes of *respondeat*

*superior* is not on the tortious acts themselves, but rather on whether earlier acts that were within

the employee's potential scope of employment "resulted in" those intentional torts. *See Fearing*,

328 Or. at 374; *Bray*, 164 Or. App. at 140-141. For example, in *Bray*, the Court of Appeals held

that a jury could find a parking lot owner was vicariously liable for parking attendant's stabbing

of a third party who parked in defendant's lot without permission, where the defendant instructed

the attendant not to allow the third party to park there any longer and the attendant subsequently

denied the third party entrance to the garage, leading to a violent physical confrontation. *Bray*,

164 Or. App. at 140-141.

Here, as in *Bray*, a jury could find that the alleged torts were directly caused by the

December Officer's investigation, which was potentially within the scope of his employment,

escalated into commission of the alleged torts. The evidence suggests the December Officer

arrived at the Property to perform some type of investigation, but that fairly soon the tensions

rose during the interchange between the December Officer and the Dauvens, particularly when

Page 16 - FINDINGS AND RECOMMENDATION

Dauven walked off the porch towards the December Officer's truck. This led directly to the December Officer touching Dauven and instructing him to remain on the porch. Thus, assuming the December Officer was an employee, his investigation of the property at the behest of the Defendants initiated a string of events that quickly culminated in the alleged intentional torts. As such, *respondeat superior* provides a potential avenue for Dauven to establish defendants' liability.

### 2.      Non-Employee Agent Liability

#### a.      Agency Relationship

As a threshold question, the court must determine whether a reasonable jury could find that the December Officer was a non-employee agent of the Defendants. An individual must meet two requirements before a court will consider him an agent of another: (1) the individual must be subject to another's control; and (2) the individual must act on behalf of the other person. *Vaughn v. First Transit, Inc.*, 346 Or. 128, 136, 206 P.3d 181, 187 (2009). Starting with the second requirement set forth in *Vaughn*, there is at least some evidence in the record that the December Officer was acting "on behalf" of the Defendants. (Barbara Dauven Decl., at ¶¶ 10-14.) The December Officer stated that he was at the property on behalf of the "owner" and acting on information only obtainable through the "owner," although he never identified the Defendants by name. *Id.* at ¶ 9.

There are also sufficient facts in the record from which a jury could find the first prong of the *Vaughn* test to be satisfied. As described above, a jury could conclude that the December was not a police officer. Further, given that the December officer admitted he was investigating the property on behalf of its owners, and that he knew the details of Plaintiff's prior responses to

threatened eviction by the Defendants, a reasonable jury could find the December Officer was a non-employee agent under the control of Defendants.

> ### b.    Actual or Apparent Authority

As described earlier, a principal is liable for the torts of a non-employee agent "only if those actions are within the actual or apparent authorization of the principal."[3] *Jensen*, 336 Or. at 231. This approach stands in contrast to the doctrine of *respondeat superior*, under which a principal is liable for *all torts* committed by an employee acting within the scope of employment, whether or not they were specifically authorized. Thus, "a principal is vicariously liable for an act of its nonemployee agent only if the principal intended or authorized the result or the manner of performance of that act." *Vaughn*, 346 Or. at 137–138 (en banc) (internal quotations omitted). The *Jensen* court explained:

> [T]he fact that a principal has the right to control some acts of its non-servant agent in furtherance of the principal's business does not mean that the principal has the right to control all those acts. If a principal were liable for all the torts of a non-servant agent

---

[3] Oregon courts explain the types of actual or apparent authority as follows:

Actual authority may be express or implied. When a principal explicitly authorizes the agent to perform certain acts, the agent has express authority. However, most actual authority is implied: a principal implicitly permits the agent to do those things that are "reasonably necessary" for carrying out the agent's express authority. In contrast, a principal also may be bound by actions taken that are "completely outside" of the agent's actual authority, if the principal allows the agent to appear to have the authority to bind the principal. Such a circumstance is called "apparent authority."

For a principal to be bound by an agent's action, the principal must take some affirmative step, either to grant the agent authority or to create the appearance of authority. An agent's actions, standing alone and without some action by the principal, cannot create authority to bind the principal.

*Taylor v. Ramsay-Gerding Constr. Co.*, 345 Or. 403, 410, 196 P.3d 532 (2008) (citations omitted)

Page 18 - FINDINGS AND RECOMMENDATION

performed in furtherance of the principal's business, whenever there was some evidence that the principal had a "right to control" the agent only in some respects, then the principal could face liability for conduct of the agent that the principal did not in fact control or have a right to control. The law of agency does not extend that far.

*Jensen*, 336 Or. at 237.

Here, Defendants argue that the full extent of the December Officer's potential authority – whether actual or apparent– was to investigate whether the Property was still occupied. Thus, they contend, the December Officer's tortious conduct at the Property exceeded the scope of his actual or apparent authority. In support, Defendants point to Barbara Dauven's testimony that the December Officer stated his purpose was to investigate whether and why the Dauvens were still at the Property and Plaintiff's repetition of that fact in briefing. (Barbara Dauven Decl., #96, at ¶¶10-14); (P.'s Br., #95, at 10.) Defendants therefore satisfy their initial burden on summary judgment of informing the court of the basis for its motion regarding agency liability and of identifying the portions of the record which they believe demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 318, 323 (1986).

The burden then shifts to Dauven, the non-moving party, to show that a genuine issue of fact remains by providing significant probative evidence from which a rational jury could find that the December Officer possessed actual or apparent authority to commit the alleged intentional torts. *See* Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986). Dauven notes that the December Officer did not need to turn on his truck's flashing red lights if his true motive was merely to investigate the Dauven's presence at the Property, since any passerby could see from the cars in the driveway and various other signs that the Property was inhabited. Dauven therefore infers that the owners' intent in sending the December Officer was to intimidate the Dauvens, not just investigate their presence. But the December

Page 19 - FINDINGS AND RECOMMENDATION

Officer's use of flashing lights is hardly probative of whether Defendants took some affirmative step to cloak the December Officer in actual or apparent authority to touch and confine Ted Dauven. *See Taylor*, 345 Or. at 410 ("An agent's actions, standing alone and without some action by the principal, cannot create authority to bind the principal"). Likewise, the Dauven's speculation about the Defendants' true intent is not supported by evidence concerning Defendants' conduct.

Dauven also notes that the December Officer revealed that the owners of the Property had given him various pieces of information, which Barbara Dauven informed him were false or incomplete. (Barbara Dauven Decl., #96, at ¶¶11-13.) This testimony at least implicates an affirmative act by the Defendants– conveying information to the December Officer. But even so, nothing about the Defendants' putative communications with the December Officer suggests that they "intended or authorized" either the "result" (the battery and false imprisonment) or "the manner of performance" (the intimidating show of force by a purported police impersonator) of the December Officer's actions, as would be required to find Defendants vicariously liable for the December Officer's conduct as a non-employee agent. *See Vaughn*, 346 Or. at 137–138. In sum, even assuming the December Officer was Defendants' non-employee agent, Plaintiff fails to present significant evidence indicating that the Defendants authorized the December Officer to do anything more than investigate why they had not left the Property. Consequently, the Defendants cannot be vicariously liable for the December Officer's tortious conduct as a non-employee agent.

### 3.   Liability for Actions of Officer

Finally, in rare circumstances, private citizens who make a report of a crime to law

enforcement may be liable for an intentional tort based on an officer's subsequent response.   In

*Delp v. Zapp's Stores*, 238 Or. 538, 395 P.2d 137 (1964), the Oregon Supreme Court noted that:

> Where the officer arrests at the direction of a private citizen, the latter is liable. The fact that the officer rather than the citizen actually makes the arrest is immaterial if the former acted entirely at the direction of the latter. The citizen is regarded as the 'cause' of the arrest. If, however, the individual merely lays the facts before the officer and the latter, acting on his own judgment and discretion, makes the arrest, the former is not liable.

*Id.* at 547 (quoting 1 Harper and James, The Law of Torts, 279, § 3.18 (1956)).  Thus, for

example, where the private citizen does "not expressly or impliedly direct the officer to make any

detention," the private citizen cannot be held liable for false imprisonment based on the officer's

detention. *Id.* at 547-548.   Similarly, a private individual may can be liable for a battery

physically committed by a police officer, under the theory that a battery can be accomplished

indirectly through an intervening agent, but only where the individual intends the resulting

harmful or offensive contact. *See Brown v. Far West Fed. Sav. & Loan Assoc.*, 66 Or.App. 387,

393, 674 P.2d 1183, 1187 (Or. Ct. App. 1984) (plaintiff could not establish bank was liable for

alleged battery committed by police officers responding to reported bank robbery where the bank

merely called the officers to the scene and the officers' subsequent actions "resulted from their

reliance on their personal judgment and discretion").

Here, even assuming the jury finds the December Officer was a law enforcement officer

and that he acted upon a report from Defendants to visit the Property, Defendants would not be

liable for his subsequent conduct.  At most the facts suggest that Defendants briefed the

December Officer on the Plaintiff's tenancy situation and the legal basis for Defendants'

ownership of the Property.  Acting on the Defendants' version of the facts, the December Officer

then investigated the property.  All the facts indicate that the December Officer then exercised his

Page 21 - FINDINGS AND RECOMMENDATION

discretion and judgment in touching Plaintiff and requiring him to remain on his porch.  As such,

Defendants cannot be liable for the December Officer's alleged battery and false imprisonment

here.

### C.    Merits of Battery and False Imprisonment Claims

Given that Plaintiff can potentially establish Defendants' vicarious liability under a

*respondeat superior* analysis, I turn to the merits of his claims.

#### 1.    Battery

Defendants argue that Plaintiff fails to state a claim for battery because the December

Officer's momentary physical contact with Plaintiff was justified, primarily relying on cases

holding that battery claims do not lie against police officers for physical force reasonably

necessary to accomplish their duty as officers.  *See, e.g., Gigler v. Klamath Falls*, 21 Or. App.

753, 763, 537 P.2d 121 (1975).  While this argument might have been sufficient if the December

Officer was undisputedly a police officer, the December Officer's identity is still very much a

question of fact.  Accordingly, Defendants cannot show that Plaintiff's battery claim fails as a

matter of law.

#### 2.    False Imprisonment

Under Oregon law, false imprisonment[4] is "the unlawful imposition of restraint on

another's freedom of movement." *Walker v. City of Portland*, 71 Or. App. 693, 697, 693 P.2d

1349 (1985).  Such restraint may be accomplished by actual or apparent physical barriers,

compulsive physical force, a threat to apply physical force, or assertion of legal authority.

---

[4] Oregon courts also refer to false imprisonment as the tort of "false arrest." *See, e.g., Ross v. City of Eugene*, 151 Or. App. 656, 663, 950 P.2d 372 (1997).

*Gaffney v. Payless Drug Stores*, 261 Or. 148, 492 P.2d 474 (1972). The restraint may be brief. *Lukas v. J.C. Penney Co.*, 233 Or. 345, 353, 378 P.2d 717 (1963). The tort of false imprisonment involves four elements: 1) the defendant confined the plaintiff; 2) the defendant intended the act to cause the confinement; 3) the plaintiff was aware of the confinement; and 4) the confinement was unlawful. *See Ross v. City of Eugene*, 151 Or. App. 656, 663, 950 P.2d 372 (1997). These elements constitute factual issues that are generally decided by the trier of fact. *Id.*

Here, Defendants argue that Plaintiff cannot satisfy the fourth element, that the imprisonment was unlawful.[5] Defendants note that an intentional restraint of another is lawful if justified by consent or by some valid authority or right. *See Knight v. Baker*, 117 Or. 492, 495, 244 P. 543 (1926). Defendants posit that, as a police officer, the December Officer was justified in asking Dauven to remain on the porch to prevent Dauven from entering the house and getting a weapon. Just as with the battery claim discussed above, Defendants' reliance on the December Officer's position as a police officer cannot dispose of Plaintiff's false imprisonment claim because his identity is a matter of factual dispute.

Defendants also insist that Dauven consented to his confinement because he complied with the December Officer's "request" to stay on the porch, which was not backed up by any threat to arrest Dauven if he did not comply. Oregon courts, however, recognize that false imprisonment may occur even without the use of physical force, barriers, or express threats. Restraint sufficient to constitute false imprisonment may also accomplished by "assertion of legal

---

[5] It is important to note that an intentional restraint of liberty is presumed to be unlawful, and Defendants have the burden to show that the imprisonment at issue here was not lawful. *Easton v. Hurita*, 290 Or. 689, 691–692, 625 P.2d 1290 (1981).

authority." *Buckel v. Nunn,* 133 Or. App. 399, 405, 891 P.2d 16 (1995). As one court explained, such restraint "may be accomplished by words or acts which such individual fears to disregard." *Roberts v. Coleman,* 228 Or. 286, 297, 365 P.2d 79 (1961) (internal quotations omitted). Thus, threats, whether express or implied, may arise from "words or conduct [that] induce a reasonable apprehension of force . . . ." *Id.*

Here, a jury could find the December Officer's words and conduct placed Dauven under a reasonable apprehension that the December Officer would employ force if Dauven did not remain on the porch, even though the December Officer never specifically threatened to arrest him if he went inside the house. According to Plaintiff's uncontested account, the December Officer wore a SWAT-style uniform with a large bulletproof vest, carried a slap jack, drove a truck with flashing red lights, and identified himself as a police officer, all of which indicate that the December Officer was prepared to use force. (Ted Dauven Depo., at 88:1-24.) Further, not long before ordering Plaintiff to remain on the porch, the December Officer threatened to have the Dauvens arrested if they refused to "cooperate," which could easily be interpreted as a continuing threat. (Ted Dauven Depo., at 114:1-9.) Finally, the December Officer had actually used physical force– placing his hands on Dauven's chest– just moments before ordering Dauven to remain on the porch. All of these circumstances could lead a jury to conclude that Dauven reasonably anticipated that the December Officer would use force to prevent him from leaving his porch. Accordingly, Defendants are not entitled to summary judgment on the merits of Dauven's false imprisonment claim.

///

///

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Leave to File Supplemental and Amended Complaint (#75) should be denied and Defendant's Motion for Summary Judgment (#91) should be denied.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 7th day of September, 2012.

Honorable Paul Papak
United States Magistrate Judge